Argued and submitted August 18, affirmed September 22, 1980

MABIN, et al,
*Respondents,*
*v.*
TUALATIN DEVELOPMENT CO., INC., et al,
*Appellants.*

(No. A7809-15614, CA 16230)

616 P2d 1196

Frank V. Langfitt, III, Portland, argued the cause for appellants. With him on the brief was Lindsay, Nahstoll, Hart, Neil & Weigler, Portland.

J. Bradford Shiley, Portland, argued the cause and filed the brief for respondents.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

RICHARDSON, P.J.

## RICHARDSON, P.J.

Plaintiffs complaint alleged two causes of action: (1) common law fraud and (2) violation of Oregon's Unlawful Trade Practices Act, ORS 646.605 *et seq.,* involving their purchase of a home. The jury awarded them $2,500 compensatory damages and $12,500 punitive damages against both defendants on their second claim.[1] Defendants appeal, contending the trial court erred in denying their motions to strike plaintiffs' punitive damages claim; in denying their motions for judgment notwithstanding the verdict; and by failing to clearly instruct the jury regarding plaintiffs' second cause of action.

Defendant Tualatin Development Co., Inc. (TDC) was the developer of a Portland area subdivision known as Quail Park. Defendant King City Realty Co. dba Prestige Properties (Prestige) handled the sales of TDC's properties located there. At the time of this action, the two defendants were separate legal entities but shared a common president and generally the same shareholders.

In early 1978, plaintiffs became interested in a residence in Quail Park. They were attracted to one of the "ridge houses" which afforded a view of Mt. St. Helens and the surrounding area. On January 28, 1978, they signed an earnest money agreement for that home and moved in later that spring.

TDC owned the lots across from and below plaintiffs' property. One residence had been constructed on one of those lots at the time plaintiffs viewed the property. The house was built so that its roofline did not obstruct the view from the ridge houses. In January 1978, TDC sold two of these lots to an outside builder. Construction began on homes there later that spring. In June 1978, plaintiffs discovered the construction would block their view. Upon completion, their view was impaired.

---

[1] The jury did not award plaintiffs either compensatory or punitive damages with respect to their first claim. No issue is raised on appeal as to this result.

Plaintiffs' second claim was based on ORS 646.608(1)(e).[2] They specifically alleged the defendants represented that the lots across the street were subject to suitable height restrictions which were sufficient to protect their view. They sought punitive damages as provided in ORS 646.638.[3]

Defendants moved at the close of trial to strike the punitive damages claim. The court denied their motions. Plaintiffs were awarded the punitive damages noted above. The court's denial is assigned by defendants as error.[4]

Plaintiffs prevailed at trial. We view all evidence and all reasonable inferences which may be drawn from such evidence in the light most favorable to the plaintiffs and we resolve any conflicts in the evidence in their favor. *Davis v. Portland General Electric Co.,* 286 Or 195, 197, 593 P2d 1135 (1979); *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 811, 562 P2d 545 (1977); *Hansen v. Bussman,* 274 Or 757, 759, 549 P2d 1265 (1976).

---

[2] ORS 646.608(1)(e) provides:

"(1) A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person:

"(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that he does not have."

[3] ORS 646.638(1) provides:

"(1) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of wilful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater. The court or the jury, as the case may be, may award punitive damages and the court may provide such equitable relief as it deems necessary or proper."

[4] Defendants' third and fourth assignments of error are based on the court's denial of their motions for judgment notwithstanding the verdict. The grounds for these motions were identical to those made in their motions to strike at the close of trial. Since they raise identical arguments, we do not discuss them separately.

The evidence showed that prior to their completion in late 1977, the ridge houses were inspected and a determination was made as to how the homes should be priced for ultimate sale. The inspection was attended by Mr. Luton, president of both TDC and Prestige, Mr. Dunn, broker for Prestige, and Mr. Adams, TDC's designer. It was decided that because of the view from the homes, a higher price would be set. To preserve the view, it was apparent some control over the height of homes built below had to be maintained. No restrictions were placed on the property by TDC at that time since TDC owned the lots and intended to handle any future construction. View protection was left to an "in house" agreement which would restrict the height of future homes built across from the ridge lots. Within a very short time two lots below plaintiffs' were sold. No restrictions regarding height or view protection were included by TDC in the deeds to these lots.

Plaintiffs were shown the ridge homes by Jim Hendryx, Prestige's top salesman. There was testimony to the effect that Hendryx was well aware of the factors which went into the pricing of the homes. Plaintiffs testified that they were specifically told the houses were more expensive because of the view. They asked Hendryx if there were any restrictions in effect to protect the view and were told that there were. They were told no home across the street would be higher than the roofline of the one existing structure.

By the time of these discussions, Hendryx had reviewed the subdivision public report. The report included all applicable restrictions and covenants for the subdivision. The jury could reasonably have concluded that he knew there were no easements, restrictions, covenants or anything else concerning view protection. Hendryx testified that even with this knowledge, he gave plaintiffs oral assurances that height restrictions existed and that their view would be protected. In June, 1978, when plaintiffs became concerned about construction on the lower lots, Hendryx again assured them the view would be protected. Plaintiffs

subsequently contacted both Adams and Luton at TDC but were unsuccessful in eliminating the problem.

■ The test to determine whether punitive damages are recoverable under ORS 646.638 is identical to that applied in a claim based upon common law fraud. *Crooks v. Payless Drug Stores,* 285 Or 481, 592 P2d 196 (1979). Such damages are proper to deter similar future conduct and when conduct is particularly aggravated. The basis for such damages was stated in *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 435 P2d 306, 27 ALR3d 1268 (1967):

> "Punitive damages can only be justified on the theory of determent. See Hodel, The Doctrine of Exemplary Damages in Oregon, 44 Or L Rev 175 (1965). It is only in those instances where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent, that the use of punitive damages is proper. Regardless of the nomenclature by which a violation of these obligations is described (grossly negligent, willful, wanton, malicious, etc), it is apparent that this court has decided that it is proper to use the sanction of punitive damages where there has been a particularly aggravated disregard * * * [of the rights of the victim]." 248 Or at 425.

■ Defendant Prestige argues that Hendryx's actions were the result of a lack of communication between TDC and Prestige. It contends Hendryx believed at the time plaintiffs purchased their home that TDC's "internal policy" would protect plaintiffs and that neither he nor anyone else at Prestige knew TDC could not or did not protect plaintiffs when it sold the lots across from plaintiffs' property.

This argument is not persuasive. Hendryx was an experienced and highly successful real estate salesman. The evidence showed he was aware that plaintiffs were particularly concerned about preserving the view; that he knew the view was a prime reason for the price plaintiffs paid for the house; that notwithstanding, he gave plaintiffs unfounded and unsupportable assurances that they would be protected. The assurances were specifically excluded from the

earnest money agreement plaintiffs signed after their discussions. Similar assurances were made by Hendryx and other Prestige salesmen to other purchasers. At no time were there means to enforce them. Finally, when plaintiffs complained to Hendryx, he pressed them for their approval of the construction plans which as drawn would have resulted in the loss of their view.

These actions reveal a deliberate and conscious effort to misrepresent to plaintiffs the facts with respect to any view protection. Such conduct is ground for imposition of punitive damages. In *Allen v. Morgan Drive Away,* 273 Or 614, 542 P2d 896 (1975), the court noted:

> "* * * The evidence reveals a deliberate and calculated effort to misrepresent the facts * * *. This is the kind of conduct which should be deterred. The imposition of punitive damages will help to deter it." 273 Or at 616.

More recently in *Green v. Uncle Don's Mobile City,* 279 Or 425, 568 P2d 1375 (1977), the Supreme Court stated:

> "* * * We have consistently held that the intentional statement of an untruth for the purpose of taking a plaintiff's money is the violation of a societal interest sufficiently great to warrant punitive damages." 279 Or at 432.

The award of punitive damages was proper. The trial court did not err in denying defendant Prestige's motions.

■ Defendant TDC also argues that there was insufficient evidence to support a punitive damages award against it. This contention rests primarily on the testimony of Luton, its president. He stated that all salesmen knew there were no covenants and height restrictions in the subdivision and that he was unaware of any representations concerning such restrictions.

The evidence established otherwise. Luton, as president of both TDC and Prestige, took an active part in the sale of properties in Quail Park. He priced

the ridge homes and the reasons for the pricing were discussed by him with others employed by TDC and Prestige. The obvious prime consideration was the view. He personally negotiated the sale of the lots below plaintiffs' residence to an outside builder without putting any height restrictions or other protection in the deeds. He did nothing either before or after the sale to inform any salesmen there were no guarantees that the view was protected.

The jury could have found that TDC encouraged the representations by Prestige's salesmen knowing there were no grounds for such assurances. Both TDC's designer and Luton tried to avoid any responsibility for the representations. Nothing was done by anyone at TDC to rectify the salesman's misrepresentations or otherwise protect plaintiffs' view. This type of conduct justifies the award of punitive damages. The trial court did not err in denying TDC's motions respecting plaintiffs punitive damages claim.

Defendants' final assignment of error relates to the court's instruction regarding plaintiffs' second cause of action. The instructions taken together correctly informed the jury on the law applicable to the second cause of action.

Affirmed.